van Gestel, J.
These consolidated cases are now before the Court on cross motions for summary judgment and other relief, pursuant to a November 27, 2001 memorandum and order, full familiarity with which is presumed. In that memorandum and order it was directed that:
The Court will proceed to hear all aspects of the August31, 2001 DRB[3] Order #3 on cross-motions *453 for summary judgment, principally filed in case No. 01-4452 BLS, but applying to all cases except No. 01-3925 BLS. The hearing on these motions, whether seeking to confirm, vacate or take any other appropriate action in connection with Order #3, will occur on Monday, February 25, 2002, at 10:00 a.m. The Court will reserve the entire morning for these arguments.
The CA/T’s amended complaint and proceedings thereon in'case No. 01-3925 BLS to vacate DRB Order #9 concerning PKC’s utility impact claim will be scheduled after decisions are rendered on the foregoing matters.
On July 9, 2001 and on August 13, 2001, this Court filed memoranda relating to other aspects of several of these cases. Again, full familiarity with each of those memoranda is presumed. Further, because in the August 13, 2001 memorandum the Court set forth its understanding of much of the pertinent background [13 Mass. L. Rptr. 564], the Court will not here repeat everything it said there. It will, however, state again those facts necessary to understand these rulings and set forth what it understands to have happened since August 13,2001, at least insofar as that also may have a bearing on the decisions made here.
ADDITIONAL BACKGROUND[4]
On March 25, 1999 the CA/T Project and PKC entered into the binding dispute resolution agreement (the “Binding DRB agreement”) which is at the heart of this memorandum. The Binding DRB agreement authorizes a DRB to issue final, binding, and conclusive determinations on certain disputes pertaining to specific claims listed on Exhibit 1 to the agreement.
There are four sections in the Binding DRB agreement that bear reciting here:
3. In an effort to resolve any and all claims for additional compensation or credits (“claims”), which are related to events which occurred prior to January 1, 1999 the Parties agree on the following binding dispute resolution process which will supersede and/or supplement, where appropriate, the dispute resolution process set out in Division 1, Subsection 7.16 et seq., of the Contract.
4. The Parties have compiled a list of claims which, subject to the provisions of Paragraph Seven (7) below, includes any and all claims by the Parties related to events which occurred before January 1, 1999 and which the Parties intend to submit to the following dispute resolution process. A copy of the list is attached hereto as Exhibit 1.
5. The Parties intend to resolve any and all disputes concerning the claims listed on Exhibit 1 through agreement. However, if the Parties cannot resolve a dispute by agreement, the Parties grant to the existing Disputes Review Board and/or, any Supplemental Disputes Review Board established by agreement of the Parties (“DRB”), the exclusive authority to adjudicate any and all such disputes including, but not limited to, any dispute concerning PKC’s claim for delay, inefficiency and/or other overall impact costs.
8. The DRB and/or any supplemental DRB acting under the provisions of this Agreement, shall have the authority to act upon the majority vote of the members of the DRB and, any Order and/or Award issued by the DRB pursuant to a majority vote of its members, shall be valid, final and binding upon the Parties and shall be enforceable by the Superior Court of the Commonwealth of Massachusetts.
A set of Amended Meeting Rules and Procedures Regarding Binding Adjudication was adopted under the Binding DRB agreement. These Rules are intended “to expedite the proceedings.” Among other things, the Amended Meeting Rules provide, in Paragraph 3.OH, that:
Within two (2) days after the date upon which a meeting(s) on a claim is concluded, the DRB shall issue its Award regarding the claim. The Award need not include detailed findings and/or recommendations concerning the claim provided that the Award includes (1) a brief description of the claim, (2) a determination as to liability for the claim, (3) each element of cost constituting an adjustment to the Contract Price for the claim, (4) each element of time constituting an adjustment in Contract Time for the claim, and (5) each element of any other relief found due to a party for the claim.
After a hearing, the Second DRB issued its Order No. 3 on August 31, 2001, in which it rendered findings on numerous issues, including the CA/T Project’s contentions that some of PKC’s filings and parts of the Second DRB’s Order did not comply with the provisions of the Binding Agreement between the parties. According to the CA/T Project, the Second DRB rejected all of the CA/T Project’s arguments and: (1) refused to abide by the “adjudication” of the First DRB as to global application of the “10-10 Markup”: (2) refused to abide by the Project Director’s Decision on the same issue; (3) refused to enforce the Final Determination Requirement with respect to the Quantum Claim, the Revised Quantum Claim or the Subcontractor Claims; and (4) refused to require certification in accordance with the Requirements of the Contract Documents.
The Second DRB, again according to the CA/T Project, did all of this in disregard of the fact that no Final Determination had been issued on PKC’s original or updated Quantum claim; that PKC had not submitted its subcontractor claims to the CA/T Project in accordance with the Contract Documents; and despite the fact that no Final Determination had been issued *454 on the subcontractor claims, awarded PKC monetary damages in connection with those claims.
In all, the CA/T Project reports that the Second DRB, in its Order No. 3, made the findings summarized below:
a. Reconsidered the applicability of the First DRB’s decision of the 10-10 Issue. Refused to recognize the First DRB’s decision.
b. Reconsidered the binding effect of the Project Director’s Decision on the 10-10 Issue. Concluded that it was not bound by the Project Director’s Decision.
c. Refused to defer ruling until the Superior Court acted on motions to be heard on August 3, 2001.
d. Reconsidered its jurisdiction over the Quantum Claim because of the lack of CA/T Final Determination. Concluded that it did have jurisdiction over the Quantum Claim despite the lack of a Final Determination.
e. Concluded that PKC’s revision of the Quantum Claim after non-renewal of Second DRB term did not deprive the Second DRB of jurisdiction to hear the revised claim.
f. Considered whether CA/T had been denied its right to a fair hearing due to inadequate notice of revisions to the Quantum Claim. Concluded that the Binding Agreement, Exhibit 2, Paragraph 3.0C, allows revisions to information submitted by a Party, that both Parties have in fact revised information, and, therefore, neither Party would be prejudiced by the hearing.
g. Reconsidered whether Amended .Meeting Rules require it to issue subsidiary findings. Concluded that its prior orders comply with the requirements of Amended Meeting Rules and refused to issue a revised award.
h. Considered the issue of whether the DRB hearings had been held out of sequence. Found that there was no prejudice to either Party arising from the sequence of hearings.
i. Reconsidered the issue of the CA/T Project’s 239-Day Counterclaim in the context of Order No. 3A. After reconsideration, the Second DRB refused to change Order No. 3A to specifically address the Counterclaim.
j. Considered whether subcontractor claims added to the Quantum Claim just prior to hearing were properly before the DRB. The Second DRB concluded that it had jurisdiction despite lack of Final determination on these claims.
k. Reconsidered whether lack of Claim Certification barred DRB consideration of Time II and Quantum Claims. The Second DRB concluded that lack of certification was no bar to DRB adjudication of the Time II and Quantum Claims.
DISCUSSION
PKC has filed a motion seeking summary judgment to confirm and enforce DRB Order No. 3. The CA/T Project has cross-moved for summary judgment on its application to vacate Order No. 3 and for a declaratory judgment.[5]
What is before the Court is an arbitration proceeding. PKC insists that the Federal Arbitration Act, found in Title 9 U.S.C., controls. The CA/T Project prefers the Massachusetts Arbitration Act found in G.L.c. 251. Not a lot seems to turn on which of the two statutes is applied. Most of the law under each is quite similar on the issues before the Court. Consequently, both Federal and Massachusetts cases will be cited.
As this Court observed in its August 13, 2001 memorandum, arbitration is a matter of contract, and a party cannot be required to submit any dispute to arbitration unless it has agreed to do so. Local Union No. 1710, Intern. Ass’n of Fire Fighters, AFL-CIO v. City of Chicopee, 430 Mass. 417, 421 (1999); Rae F. Gill, P.C. v. DiGiovanni, 34 Mass.App.Ct. 498, 501 (1993). Courts have very limited roles to play in matters in arbitration. Basically, a judge may, at the beginning, determine whether the parties have agreed to arbitrate a particular matter and, at the end, subject to a very narrow scope, determine whether to set aside the arbitration award. Once it is determined according to the parties’ agreement that a matter should be arbitrated, then questions relating to the procedures to be followed and the interpretation of the agreement are for the arbitrators, not the Court. See Bull HN Info. Sys., Inc. v. Hutson, 229 F.3d 321, 330 (1st Cir. 2000); Coastal Oil v. Teamsters Local A/W, 134 F.3d 466, 469 (1st Cir. 1998); Barnstead v. Ridder, 39 Mass.App.Ct. 934, 936 (1996). “Judicial review of an arbitration award is among the narrowest known to the law.” Maine Cent. R.R. Co. v. Brotherhood of Maintenance of Way Employess, 873 F.2d 425, 428 (1st Cir. 1989). The arbitration award may only be set aside if the arbitrators exceeded the scope of their authority or decided the matter based on fraud, arbitrary conduct, or procedural irregularities in the hearing. See, e.g., Advest, Inc. v. McCarthy, 914 F.2d 6, 8-9 (1st Cir. 1990); Plymouth-Carver Regional School District v. J. Farmer & Co., Inc., 407 Mass. 1006, 1007 (1990). There is a strong public policy favoring arbitration, and Courts must be exceedingly cautious about interfering with the proceeding or its results. Bureau of Special Investigations v. Coalition of Public Safety, 430 Mass. 601, 603-04 (2000); Minton Const. Corp. v. Commonwealth, 397 Mass. 879, 880 (1986). See also Judge Giles’s September 21, 2000 Memorandum of Decision and Order Upon Plaintiffs’ Motion for Stay Under G.L.c. 251, Sec. 2(b), issued in above case No. 00-4096 BLS, at pp. 6-7.
While a determination of whether a panel of arbitrators acted beyond their authority certainly is a question open for judicial review, Trustees of Boston *455 & Maine Corp. v. M.B.T.A., 363 Mass. 386, 390-91 (1973),
[u]nlike our review of factual findings and legal rulings made by a trial judge, we are strictly bound by an arbitrator’s findings and legal conclusions, even if they appear erroneous, inconsistent, or unsupported by the record at the arbitration hearing. “A matter submitted to arbitration is subject to a very narrow scope of review. Absent fraud, errors of law or fact are not sufficient grounds to set aside an award” .•. . “Even a grossly erroneous [arbitration] decision is binding in the absence of fraud".. . “An arbitrator’s result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be the subject of court interference.”
City of Lynn v. Thompson, 435 Mass. 54, 6 1-62 (2001). See also Drywall Systems, Inc. v. ZVI Construction Co., Inc., 435 Mass. 664, 666-67 (2002); Town of Reading v. Reading Patrolmen’s Ass’n, Local 191, 50 Mass.App.Ct. 468, 471 (2000).
It is within the foregoing substantial constraints that this Court now assesses the situation presented by the cross-motions before it.
The CA/T Project set the stage for its argument on the very first page of its memorandum of law in support of its motion. There it said:
Under the Binding Disputes Resolution Agreement (“Binding Agreement”) between PKC and the CA/T Project, a Disputes Review Board (“DRB”) is empowered to do two fundamental things. First, it may hear certain, enumerated disputes once those disputes have become ripe for adjudication pursuant to the jurisdictional limits agreed to by the parties. Second, it may issue a certain type of relief, in a manner defined by the parties’ agreement.
This, of course, is what every validly constituted arbitration panel is charged with doing — hearing disputes and issuing relief.
The CA/T Project then explained, at p. 2 of its memorandum, what it was that it was charging the Second DRB with doing, or failing to do.
The so-called Second DRB failed in both respects in issuing its Order No. 3 (“Order No. 3”), initially when it adjudicated issues that were either not ripe for adjudication or that the parties never agreed to arbitrate in the first place, and then when it rendered an award that did not comply with the type of award it was empowered to render. In the course of doing so, the Second DRB deprived the CA/T Project of the arbitration process for which it bargained in negotiating the arbitration agreement in question.
The Court does not wholly agree with the implications of all of the CA/T Project’s position. The arbitration process for which it bargained is not what the CA/T Project subjectively desired to achieve by the proceeding, but rather is what is contained in the language of the Binding DRB agreement, as that arbitration process is controlled by the law that applies thereto. Thus, while some of what the CA/T Project complains about may rightly be reviewed by the Court, most is not subject to Court interference and remains entirely within the purview of the arbitrators, here the Second DRB.
In order to fully understand what it is that the CA/T Project is complaining about, some history prior to the execution of the Binding DRB agreement bears repeating and examination. The C11A1 Contract in issue has always included a provision for a dispute resolution process. Originally, however, that process was nonbinding.
The dispute resolution processes involve a Disputes Review Board established pursuant to Division I, Subsection 7.16C of the Cl 1A1 Contract. The members of the DRB are required to be highly qualified and knowledgeable individuals. The two DRB members, selected one each by the CA/T Project and PKC respectively, must have “substantial engineering or construction experience. They also must have ”at least ten (10) years experience in their respective professions and substantial experience in the type of construction involved in the Contract, in the interpretation of Contract Documents, and in the analysis and resolution of construction claims." Persons with professional qualifications in fields other than construction or engineering are specifically said to be “not considered desirable as DRB candidates.” And the Chairperson, chosen by the other two, must have the same qualifications and fifteen years of such experience. See Subsection 7.16D.1. and 2 (a. and b.).
What is called for in DRB membership are construction industry experts, not lawyers, judges or professional arbitrators. Substantive knowledge and experience in construction projects of the kind involved, not deep learning in the law, is mandated.
As originally created, the DRB was to hear disputes and to issue non-binding findings and recommendations. The recommendations from this non-binding process then would be referred for a decision to the Project Director. If, within a defined time, the contractor — here, PKC — did not appeal the Project Director’s decision either to the Massachusetts Highway Department Board of Contract Appeals or file a suit in the Superior Court, “the Project Director’s Decision shall be final and binding, and any further administrative or judicial review shall be barred.”
If an appeal from the Project Director’s decision was timely made, “for purposes of subsequent administrative or judicial review, MGL Chapter 30, Section 39J shall apply.”
Section 5.01 of Division I of the General Requirements and Covenants of the C11A1 Contract grants authority to the “Engineer”[6]
*456 to decide all questions which may arise as to the interpretation of the Contract Documents . . .; all questions which may arise as to the quality, quantity, value and acceptability of materials furnished or to be furnished and Work performed or to be performed; all questions which may arise as to the progress of the Work and need for and manner of correcting the same, and also the need for and terms of delays and suspensions; all questions relating to the need for and terms of extra work; all questions relating to the supervision, control and direction of Work on the site and the use thereof; all questions as to the acceptable fulfillment of the Contract on the part of the Contractor.
Section 5.01 also states that “[o]nce the Engineer provides a determination, any such determination shall be final and binding on the Contractor, unless the Contractor delivers to the Department a written claim notice within ten (10) days after receipt of the determination, in accordance with Subsection 7.16.”
The entire process for dispute resolution in the matter now before the Court, including the DRB’s authority, is derived from the Cl 1A1 Contract and the Binding DRB agreement thereunder. Thus, the DRBs could only follow the particular mandates imposed therein. In this case, the scope of the Binding DRB agreement reads:
The DRB shall adjudicate any disputes between the Parties concerning claims listed in Exhibit 1 pursuant to the procedures set forth in the “Amended Meeting Rules,” a copy of which is attached to this agreement as Exhibit 2.
In its earlier decision, the Court found this to be a classic broad arbitration clause mandating what it is that the DRBs will arbitrate. It is the kind of contract language that must be construed as broadly as it was intended. Barletta v. French, 34 Mass.App.Ct. 87, 93 (1993); Carter, Moore & Co. v. Donahue, 345 Mass. 672, 676 (1963). The language covers “any disputes.” The only, but significant, limitation is that the matters to be resolved must be listed on Exhibit 1. In particular, the DRBs are given authority “to adjudicate any and all . . . disputes including, but not limited to, any dispute concerning PKC’s claim for delay, inefficiency and/or other overall impact costs.”
Pursuant to the earlier non-binding DRB procedures set out in subsection 7.16, in January of 1999 the parties submitted two disputes to the then-existent DRB (the “First DRB”). The two disputes are referred to by the parties as the “Subaru" dispute and the “BECo” dispute. While the parties were processing these two disputes, in an effort to expedite resolution of a growing backlog of disputes, they reached an accord and executed the Binding DRB agreement. The CA/T Project and PKC then agreed that resolution by the DRB of the Subaru and BECo disputes also would be binding.
The “10/10" Issue
On March 26, 1999 the First DRB issued its decisions on the Subaru and BECo claims. It found merit in PKC’s claims for direct costs and made monetary awards therefor. It found no merit, however, in PKC’s claims for delay and denied PKC’s request for an extension of contract time. Included near the end of those two decisions is the following statement:
TIME EXTENSION; COMPENSATION[7]
The Board has been requested by the parties to respond to the question of how extended overhead compensation is to be determined in cases where it is allowed. It is the opinion of the Board that the Contract requires the mark up for delay be on the “10 & 10" method rather than a ’’per diem" basis.
The above stated recommendations of the Board are the unanimous opinion of the three members and each member concurs with the recommendations.
The “10 & 10" method (sometimes referred to as the ”10/10" method) is a simple formula that limits extended overhead recovery to the direct cost of the work plus 10% overhead and a 10% markup. The per diem basis would provide a recovery based upon PKC’s actual costs incurred.
PKC suggests that it saw no need to move to modify or vacate the First DRB’s comments regarding the 10/10 issue because it was not a factor in either the Subaru or the BECo decisions.
The issue of the method of compensation for extended overhead also is not one of the specific claims listed on Exhibit 1 to the Binding DRB agreement. Nor has the Court been advised as to whether, when “requested by the parties” to answer their question, this particular determination was to be binding or non-binding.
Following the resignation for health reasons of one of the First DRB’s members, the parties selected an entirely new Second DRB. Thereafter, on February 24, 2000, PKC submitted to the Second DRB an Omnibus Time Claim. The claim is said to include “thousands of pages of documentation.”
The Second DRB issued an Order No. 1, wherein it commented on the First DRB’s opinion on the issue of extended overhead. The Second DRB said it found the opinion “unclear, incomplete and of questionable authorization.” The Second DRB also said that it was “unable to apply the previous Board’s opinion consistent with the contract provisions,” and scheduled a formal hearing on the issue for July 17, 2000.
Following the July 2000 hearing, the Second DRB, on August 18, 2000, issued its decision on Order No. 1. The decision was in two parts, designated as Order #1A and Order #1B.
Order #1A is said by the Second DRB to be in “accordance with the Binding Disputes Resolution *457 Agreement dated March 25, 1999 . . .” It concludes with the following order:
5.0 DRB ORDER #1A: The Disputes Review Board has reviewed this dispute which concerns the Contractor’s claim for delay costs, has followed the procedures prescribed in the Binding Agreement and issues the following binding order:
a. The Opinion of the previous Board on the issue of compensation for extended overhead for Owner delay as stated in Recommendations dated March 26, 1999 is not a binding Order or Award; lacks clarity and sufficient detail for application; and the procedures followed in its development fail to comply with the requirements precedent to a binding DRB adjudication pursuant to the Binding Agreement.
b. The above Opinion of the previous Board is therefore not authorized as an Order binding on the Parties pursuant to the March 25th, 1999 Agreement. The Opinion shall be considered a Recommendation subject to the non-binding DRB process set forth in the Contract Exhibit 1G, Division 1, Subsection 7.16 of the Contract specifications.
Order #1B is said by the Second DRB to be in “accordance with the [non-binding] Contract provisions, Exhibit 1G, Division 1, Subsection 7.16 . . .” It concludes with the following recommendations:
3.0 RECOMMENDATIONS:
1. The issue of computation and global application of extended overhead compensation attributable to all claims for Owner delay is outside the scope of the Binding Agreement dated March 25, 1999. The DRB is therefore providing the following non-binding recommendation:
That the Contractor should not be barred from claiming compensation for extended overhead resulting from Owner delay, and should not be limited to the 10/10 Markups referenced under Standard Specification Section 9.03, Payment for Change Orders.
2. The Board will be prepared to hear and issue Binding Orders with respect to disputes over delays and damages resulting from those claims identified in the Binding Agreement. Both Parties will be provided opportunity to fully present their positions and responses on delays and damages in accordance with the Binding Agreement.
On September 30, 2000, Michael Lewis, the then-Acting Project Director, issued a Project Director’s Decision regarding the 10/10 issue. This decision reaches the following conclusion:
For the reasons stated above,![8]] I determine that PKC’s recoverable costs for extended overhead due to owner-caused delay are subject to the formula and limitations of Subsection 9.03 of the C11A1 Contract. Specifically, payment for such costs may not exceed the 10% + 10% amounts that this provision of the contracts authorizes.
This Decision is final unless, within ninety days of its receipt, PKC takes action pursuant to Subsection 7.16 G.10 of the contract. In the interim and pending the final disposition of any appeal or litigation by which PKC challenges this Decision, the Decision shall be followed in the administration of the Cl 1A1 Contract and in the hearing and determination of all “disputes" by any DRB.
PKC filed a timely appeal from the Project Director’s Decision, which is the suit filed and docketed above as Suffolk No. 00-5700 BLS.
In its August 13, 2001 memorandum, this Court determined that the disputes resolution procedures, whether binding or not, are each a form of contractually accepted arbitration and must be treated by the Court as such. Consequently, at that stage this Court had no real role to play with the actions of the DRBs until the arbitration processes reached the point of an award, and issues about whether that award should be confirmed or set aside were presented. Thus, the determinations on the 10/10 issue by the First and Second DRBs remained untouched by the Court. Therefore, the ruling by the Second DRB in its Order #1A that it would not be bound by that of the First DRB on the 10/10 issue was not disturbed on the motion then presented.
Further, insofar as the Project Director was concerned, his power to overrule, alter or vary DRB arbitration decisions was found by this Court to be limited to those determinations that are contractually nonbinding. He could not, therefore, change the Second DRB’s Order #1A to the effect that the opinion of the First DRB on the 10/10 issue was not abinding order affecting the Second DRB.
The Project Director could, however, overrule, alter or vary the Second DRB’s non-binding Order #1B; and he did so with his September 30, 2000 Decision, PKC, however, properly brought that action before the Court in Case No. 00-5700BLS and, therefore, the Project Director's Decision was not then final and binding, and further judicial review was not then barred. Such judicial review is required by the agreement to be subject to the application of G.L.c. 30, Sec. 39J.
The Court then concluded that the Project Director’s Decision on the 10/10 issue was detailed and carefully written. Itwas clearly within his contractual authority to make such a Decision. Nor could there be any question about an absence of substantial evidence, the Decision having been made basically on an assessment of the contract documents. Nothing in the Project Director’s Decision revealed an improper application of the law relating to contracts, either as to interpretation or substance. Further, the Decision, on its face and when read against the record of two separate DRBs reaching diametrically opposite results *458 on the same 10/10 issue, could not, having come out the same as one of the two, be said to demonstrate bad faith, fraud, arbitrariness or capriciousness. Thus, there was no apparent basis for this Court to interfere with the Decision.
Next, the Court addressed the issue of whether, if at all, it should at that time explore the reach of the Project Director’s Decision on the 10/10 issue, e.g., whether it was final, binding and conclusive on the Binding DRB process and whether it applied to all disputes before the DRB — and thereby direct the Second DRB, or any later DRB, to act consistent with the Court’s view, as opposed to the DRB’s own reading and application of that Decision. Because of the well-settled law limiting intervention by judges in arbitration proceedings, this Court believed that to opine on the project Director’s ruling on the 10/10 issue would result in injecting itself into the midst and heart of the arbitration process, a place where it did not belong. Consequently, it ruled that it was up to the DRBs, during the conduct of their Binding DRB proceedings, to interpret and give such weight as they deem appropriate to the Project Director’s Decision within the context of whatever dispute was being determined.
Those claims that fall within the limits of Exhibit 1 to the Binding DRB agreement are not said to be limited by decisions of the Project Director. Thus, the Court is now faced with a situation in which it, on August 13, 2001, effectively ruled that the Project Director’s Decision on the 10/10 issue was valid and consistent with G.L.c. 30, Sec. 39J; and the Second DRB has ruled that this determination, not being an issue in Exhibit 1 to the Binding DRB agreement, was not binding on it.
This Court agrees with the Second DRB’s conclusion. Further, this is precisely one of those situations in which the Court cannot interfere with the arbitrators’ decision even if it is “grossly erroneous,” there being no evidence of fraud. City of Lynn, 435 Mass. at 61-62. It matters not, in the absence of demonstrated fraud, whether the Second DRB ignored or misread the Project Director’s Decision.
Final Determination Issue
The CA/T Project argues that the claims by PKC before the Second DRB should not have been heard because the CA/T Project had not yet issued a Final Determination under Subsection 7.16. The Second DRB, in its Order No. 8, on December 20, 2000, rejected this contention, ruling that a Final Determination by the Project Director was not a necessary prerequisite to its authority to adjudicate a claim under the Binding DRB agreement. The Second DRB said that the PKC’s claims need receive only "effective denial” by the CA/T Project. An effective denial, the Second DRB said, “may be in the form of: ... A ‘deemed’ or ‘de facto’ denial resulting from the actions, inactions or apparent intentions of the parties.”
As noted earlier at p. 7 above, once it is determined that a matter should be arbitrated, then questions relating to the interpretation of the agreement are for the arbitrators, not the Court. The agreement here, of course, is the Binding DRB agreement of March 25, 1999. That agreement supersedes and supplements the dispute resolution process set out in Subsection 7.16 of the underlying contract. Binding DRB agreement Sec. 3.
The Binding DRB agreement was specifically designed to expedite a stalled dispute resolution process. Thus, to adhere to technical steps intended to convert a “claim” to a “dispute” by requiring a Final Determination that a claim is rejected, in the face of a de facto denial resulting from the actions, inactions or apparent intention of the CA/T Project, exalts form over substance. It certainly does not advance an expedited process.
Thus, even if the determination of this issue was not — as this Court believes it is — left wholly within the ambit of the Second DRB as arbitrators, this Court would rule that, under the circumstances, the determination that a formal Final Determination was unnecessary to confer jurisdiction to arbitrate was correct. After all, in the Binding DRB agreement in Sec. 5, the parties stated their intention “to resolve any and all disputes concerning the claims listed on Exhibit 1.” They did not say that “disputes” under this agreement were the same as “Disputes” under Subsection 7.16.
Claim Certification Issue
The CA/T Project additionally argues that the form of claims certification on the matters before the Second DRB did not comply with the requirements of the underlying contract. It points to Subsection 7.16 G.2., particularly the part thereof that attaches a form of certification as “Form A.”
The Binding DRB agreement does not address the issue of claims certification. However, the Amended Meeting Rules in Article 3.0B says that “the documentary support will include contract claim certifications . . .” without defining what that may be.
The Second DRB ruled in its Binding Order #8, Issue (4) that: “There is no requirement that the Parties agree to the specific wording of a Contractor’s or Subcontractor’s Claim Certification as a necessary precedent to the Cl 1A1 DRB’s authorization to adjudicate the claim under the Binding Agreement.” The Second DRB restated this position in its Order No. 3.
Order #8 was dated December 20, 2000. Therein the Second DRB, in anticipation of hearing binding disputes, also said: “(I]n the interests of expedited resolution, it is preferable that the language [of claims certifications] is agreed to, prior to DRB adjudication and, to that end, the Board urges the Parties to reach mutual agreement on this issue in an expeditious manner.”
*459 The parties made an effort to agree on claims certification language. At least three different, but similar, forms were submitted to the CA/T Project by PKC.
In a letter dated March 20, 2001, the Second DRB again urged the parties “to mutually resolve claim certification language as indicated in the Board’s Order #8, Issue (4).” Clearly, neither the CA/T Project nor PKC was acting then as if the “Form A” claim certification form from Subsection 7.16 G.2. was the operative document.
Also, in its March 20, 2001 letter, the Second DRB advised the parties that: “In the event the parties are unable to mutually resolve the certification language prior to the Hearing continuations scheduled below, the parties are directed to present their positions and suggested certification language to the DRB in the Hearing.”
In response to the CA/T Project’s contention that agreement on the claim certification language must precede a DRB adjudication, the DRB, in its Order No. 3, made the following findings:
The issue of whether specific certification language is a necessary precedent to a DRB hearing was heard and ruled on under Binding Order #8, Issue (4). The Board has fully considered the Parties’ current submissions and presentations, and Binding Order #8, Issue (4) is unchanged.
This was a decision for the Second DRB as arbitrators to make. It will not be altered by the Court. Further, in any event, it seems a correct assessment of the situation. In the context of an expedited process under the Binding DRB agreement and the parties’ apparent concession that “Form A” was not the required form of certification, the Second DRB acted properly.[9]
Subsidiary Findings Issue
The Court next examines the issue of whether there were adequate subsidiary findings in the Order No. 3 Award. Here the Court focuses primarily on the specific directions given to the DRB in the Amended Meeting Rules noted above at p. 4. The proceedings are supposed to be expedited; the DRB’s Award must issue within two days after a meeting in which a claim is considered; and, “[t]he Award need not include detailed findings and/or recommendations concerning the claim.” Given those limitations, it is clear that what was required — much like we ask of juries in responding to special questions — is a brief but sufficient enough response so that the parties may understand what was awarded and for what reasons. By contrast — and keeping with the analogy — what is not required of the DRB are detailed findings of fact and rulings of law of the kind asked of trial judges in a juiy-waived proceeding.
The Court has examined Order No. 3. It is 11 pages long, it has 4 1/2 pages of descriptive background, it has 3-plus pages of analysis and findings, and the award portion covers 2 pages. All of these pages are in single-spaced type. There is included: (1) a brief description of the claim; (2) a determination as to liability for the claim; (3) a sufficient description of the elements of cost constituting an adjustment to the Contract Price; (4) a sufficient description of the elements of time for an adjustment in Contract Time; and, (5) a sufficient description of the elements of relief found due to PKC and its subcontractors for the claim.
Remaining Issues
Finally, the Court concludes that the remaining issues complained of by the CA/T Project with regard to DRB Order No. 3 also fall within that sphere wherein it is the decision of the arbitrators, not second-guessing by the Court, that controls. It has long been settled that “(o]nce it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, ‘procedural’ questions which grow out of the dispute should be left to the arbitrator[s].” John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964). For example, issues such as: whether to defer ruling until the Superior Court ruled on motions to be heard on August 3, 2001; permitting a revision by PKC of its Quantum claim; addressing issues of the sufficiency of notice to the parties regarding claim revisions; deciding on the sequence of the hearings; and, declining to change prior decisions, including subcontractor claims, all fall within the ambit of management by the arbitrators of proceedings that were clearly arbitrable under the Binding DRB agreement. They should not be altered by a narrowly constrained reviewing Court.
ORDER
For the foregoing reasons, the motion of the Perini-Kiewit-Cashman Joint Venture is ALLOWED; the motion of the CA/T Project is DENIED; and, the award of the Disputes Review Board in Order #3, and any prior orders subsumed therein, is CONFIRMED and shall be enforced accordingly. The prevailing parties are requested to provide the Court with a proposed final judgment.

 A “DRB" is a Disputes Review Board established by the agreements of the parties.

 This section is called “Additional Background” because it provides background information in addition to that appear- ■ ing in the prior memoranda of this Court noted earlier.

 This Court tends to agree with PKC’s observation that summary judgment motions are not really the correct vehicle for what is now before the Court. Rather, under both the Federal and the Massachusetts Arbitration Acts, at this stage of a proceeding like that before the Second DRB, the Court really must confirm the award, vacate it or send it back for further proceedings. Whatever the titles of the motions, it is the duty of this Court to insure that any final judgment “shall grant the relief to which the party in whose favor it is rendered *460 is entitled, even if the party has not demanded such relief in [its] pleadings.” Mass.R.Civ.P. Rule 54(c).

 The “Engineer" under the C11A1 Contract is defined as the Project Director.

 This is the phrase used in the BECo decision. In the Subaru decision it is worded as “DRB DETERMINATION; COMPENSATION FOR EXTENSION OF TIME." The substance that follows is identical; consequently, the Court assigns no significance to the slightly different titles.

 This Decision is 13 pages long, double-spaced, and contains a full analysis and explanation for the conclusions reached.

 This is quite unlike the situation in Newberg/Walsh v. Massachusetts Water Resources Authority, Suffolk Superior Court No. 96-1131-H (Feb. 6, 1999), where this Court dealt with contractually mandated certifications as precedent to claims resolutions and what was proffered were certifications signed in blank by the required officer in the Midwest, because, he said, it would save time getting them delivered “offshore” to Deer Island. Here the Court is dealing with actual certifications as part of an arbitration proceeding which were signed properly by the necessary officer and accepted, after hearing, by the arbitrators.